[No. B253580. Second Dist., Div. Four. June 4, 2015.]

THE PEOPLE, Plaintiff and Respondent, v.
HELEN CHUNG, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, only the Introduction, Factual and Procedural History, parts D., D.1. and 2. of the Discussion, and the Disposition are certified for publication.

**COUNSEL**

Davina T. Chen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and David Zarmi, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**COLLINS, J.—**

## INTRODUCTION

Defendant Helen Chung appeals from her conviction by jury on three counts of offering narcotics for sale, with special allegations regarding prior narcotics convictions. She was sentenced to a total term of 16 years four months and was ordered to pay various fines and fees. Chung raises a number of contentions on appeal: first, that the prosecutor improperly struck the only African-American prospective juror from the panel during voir dire; second, that evidence of her prior convictions was improperly admitted at trial; third, that one of the police officer witnesses gave improper and unqualified expert testimony; and fourth, that the consecutive sentences she received violated the bar on multiple punishment for a single act under Penal Code section 654.[1] We reverse the judgment with respect to the consecutive sentences imposed on counts five (offer to sell methamphetamine) and six (offer to sell cocaine) and remand to the trial court for proceedings consistent with this opinion. We affirm the judgment in all other respects.

## FACTUAL AND PROCEDURAL HISTORY

### A. *Procedural Background*

An information charged Chung (also known as Thuy Pham) with the following six counts: possession of methamphetamine for sale (Health & Saf. Code, § 11378; count one), possession of cocaine base for sale (Health & Saf. Code, § 11351.5; count two), possession of cocaine for sale (Health & Saf. Code, § 11351; count three), offer to sell cocaine base (Health & Saf. Code, § 11352; count four), offer to sell methamphetamine (Health & Saf. Code, § 11379; count five), and offer to sell cocaine (Health & Saf. Code, § 11352; count six). The information further alleged that Chung had suffered five prior felony narcotics convictions and had served five prior prison terms (Health & Saf. Code, § 11370.2; Pen. Code § 667.5, subd. (b)).

Chung pleaded not guilty and denied the special allegations. Following trial, the jury found Chung not guilty on the possession counts (counts one through three), but guilty on the offer to sell counts (counts four through six). Chung waived jury trial on, and then admitted, the five prior conviction allegations.

On November 13, 2013, the court sentenced Chung to a total term of 16 years four months. On count four, the court imposed the upper term of five years, plus nine years for three prior felony convictions.[2] (Health & Saf. Code,

---

[1] All further statutory references herein are to the Penal Code unless otherwise indicated.

[2] The court struck the remaining prior conviction enhancements in the interest of justice.

§ 11370.2, subd. (a).) The court imposed one-third of the middle term for count five (equaling one year) and count six (equaling one year four months), both sentences to run consecutively to count four. Chung timely appealed.

### B.   *Evidence at Trial*

#### 1.   *Narcotics Sale*

On the afternoon of March 5, 2013, Los Angeles Police Department (LAPD) Officers Hiroshi Uehara and Phillip Chan were conducting surveillance of Sergio Moran, who they believed was involved in narcotics trafficking. They observed Moran drive a gray Chevrolet Suburban south on Bixel Street in Los Angeles, pass Fourth Street, and then park behind a black Dodge Charger. Within seconds, Chung exited the Charger from the front passenger seat and entered the front passenger seat of the Suburban. Moran and Chung remained in the Suburban for "maybe a minute or two," then Chung exited the vehicle and reentered the front passenger seat of the Charger. Moran followed "shortly thereafter" and entered the rear passenger seat of the Charger, directly behind Chung. The officers testified that they were looking at Chung's and Moran's hands and clothing as they walked between the vehicles and did not observe them carrying anything.[3]

Once Moran entered the Charger, the officers decided to approach the vehicle. Officer Uehara approached the passenger side of the Charger and saw Moran holding and examining a "large off-white, crystal-like substance" in his hand, which proved to contain methamphetamine. When Moran noticed the officers, he threw the methamphetamine onto the floor. Officer Uehara then took Moran into custody, while Officer Chan removed Chung and the driver of the Charger, Angela Suh, from the front seats and took them into custody.

In addition to the methamphetamine Moran dropped on the floor of the Charger, the officers recovered a large, gallon-size Ziploc bag from the backseat of the vehicle. That Ziploc bag held four smaller plastic baggies— one containing powder cocaine, two containing methamphetamine, and one containing cocaine base. There also was a folding scale on the backseat of the type commonly used to measure narcotics. The scale was working, open and ready for use. The officers also recovered a purse containing Chung's identification and $870 in a variety of denominations from the floor of the front passenger seat, and a purse containing Suh's identification, two baggies of methamphetamine, and $20 in cash from the driver's seat. The officers

---

[3] The officers were parked on the same side of Bixel Street, just north of Fourth Street. Officer Uehara estimated they were "a hundred feet or longer" from the other vehicles, but were using binoculars to observe the suspects.

found nothing in the Charger that could be used to ingest the narcotics and neither Suh, Moran, nor Chung appeared to be under the influence of narcotics when arrested. The officers searched Moran and recovered $2,317, in a variety of denominations, and a baggie of heroin between his buttocks.

The LAPD analyzed the recovered narcotics and found that the methamphetamine dropped by Moran weighed 21.8 grams, the baggie of cocaine in the backseat weighed 44.8 grams, the baggie of cocaine base in the backseat weighed 2.86 grams, the baggie of heroin found on Moran weighed 5.97 grams, and the methamphetamine found in Suh's purse weighed 31.6 grams.

### 2. Expert Testimony

Officers Uehara and Chan testified as both percipient witnesses and narcotics experts. Officer Uehara testified that he had been a police officer for almost 11 years and had been assigned to narcotics enforcement for over three years. He received 40 hours of narcotics training in the academy and attended a five-day, 40-hour narcotics school, both included instruction as to the "identification, manufacturing, distribution, and types of usage" of all three drugs recovered here. His work in the narcotics unit "deals extensively with narcotics on a daily basis—surveillance, identification, interviewing arrestees, users, buyers of narcotics." He had posed undercover as a street dealer and a buyer, authored search warrants related to narcotics, and "talked to more experienced detectives and officers."

Officer Uehara testified that in his experience, the large amount of cash in various denominations carried by Chung and Moran suggested they were involved in a narcotics transaction, because buyers and sellers carry that type of cash to make change and to buy and sell the product. He testified that he saw drug transactions occurring inside a vehicle "all the time," but had never seen an instance where a seller brought all the drugs to the buyer's vehicle. This was an unlikely scenario because "the dealer wants to minimize risk, risk of being caught, risk of being robbed." Instead, typically, the buyer enters the seller's vehicle and exchanges money for the narcotics.

When the prosecution posed a hypothetical based on the facts of the case, Officer Uehara opined that the front female passenger (in Chung's position) possessed the narcotics for sale. He based his opinion on the large amount and different types of narcotics found, the large amount of money seized, the lack of any smoking paraphernalia at the scene, and the absence of signs of narcotics use by the suspects. He also opined that the "lack of small individual baggies . . . suggests to me that this is a mid-level size dealer as opposed to a street dealer."

Officer Chan testified that he had been a police officer for 20 years and on narcotics assignment for 11 years. He opined that the evidence in the case was consistent with a midlevel sale, as opposed to a street-level sale, based on the amounts of narcotics and money involved and the use of the scale. He testified that, in his experience, a seller would not take his or her drugs into a buyer's vehicle. Both officers acknowledged that it would be unusual for Chung, as a seller, to initiate contact by going into Moran's vehicle, even without any narcotics.

## DISCUSSION

A.–C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### D. *Error in Imposition of Consecutive Sentences*

In her supplemental opening brief, Chung claims the trial court erred in imposing consecutive sentences for her convictions on counts four, five, and six. The trial court sentenced Chung to three consecutive sentences for her convictions on offering to sell three substances—cocaine base (count four), methamphetamine (count five), and cocaine (count six). Chung contends that section 654 prohibited two of these sentences, as the conduct underlying these counts constituted a "single act" of offering to sell drugs to a single individual, Moran. We agree and therefore reverse with respect to the sentences imposed on counts five and six.

#### 1. *Legal Principles*

■    Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." This seemingly simple statute has generated decades of case law regarding the precise parameters of an "act" that triggers section 654's bar on multiple punishment. Until recently, the primary test to determine

---

*See footnote, *ante*, page 462.

whether conduct constituted an "act" for the purposes of section 654 was set forth in *Neal v. State of California* (1960) 55 Cal.2d 11 [9 Cal.Rptr. 607, 357 P.2d 839] (*Neal*), disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 334 [142 Cal.Rptr.3d 546, 278 P.3d 809] (*Correa*). In *Neal*, the California Supreme Court held that an "act" for the purposes of section 654 was not limited to a "single physical act," but could include a "'course of conduct.'" (*Neal, supra*, 55 Cal.2d at p. 19.) The test of "[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Ibid.*) While *Neal*'s "intent and objective" test and reasoning has been criticized and limited, its basic tenet has never been overruled. (See, e.g., *People v. Latimer* (1993) 5 Cal.4th 1203, 1205–1206 [23 Cal.Rptr.2d 144, 858 P.2d 611] [criticizing *Neal* but declining to overrule it].)

In 2012, the California Supreme Court decided two cases altering the landscape of permissible punishment under section 654. First, in *Correa*, the court held that "[b]y its plain language section 654 does not bar multiple punishment for multiple violations of the same criminal statute." (*Correa, supra*, 54 Cal.4th at p. 334.) The court therefore found that the defendant's multiple sentences—imposed for convictions of seven counts of being a felon in possession of a firearm based on his possession of a "cache" of guns—did not implicate section 654 and upheld them on that basis. (*Correa*, at p. 334.) The court further rejected a footnote in *Neal* suggesting (in dictum) the opposite conclusion. (*Id.* at pp. 334, 344 [rejecting dictum in *Neal, supra*, 55 Cal.2d at p. 18, fn. 1, that "[a]lthough section 654 does not expressly preclude double punishment when an act gives rise to more than one violation of the same Penal Code section or to multiple violations of the criminal provisions of other codes, it is settled that the basic principle it enunciates precludes double punishment in such cases also"].)

■ On the same day it decided *Correa*, the California Supreme Court also decided *People v. Jones* (2012) 54 Cal.4th 350 [142 Cal.Rptr.3d 561, 278 P.3d 821] (*Jones*). In *Jones*, the defendant was convicted of three crimes arising from the same incident of having a loaded gun in his car—possession of a firearm by a felon, carrying a readily accessible concealed and unregistered firearm, and carrying a loaded unregistered firearm in public. (*Id.* at p. 352.) The court found that all three offenses reflected a single act—the "single possession or carrying of a single firearm on a single occasion"—and held that "[s]ection 654 prohibits multiple punishment for a single physical act that violates different provisions of law." (*Id.* at p. 358.)

In separate opinions, Justices Werdegar and Liu stated that, while they would reach the same result, they would do so under the "intent and objective test" created in *Neal*. (*Jones, supra*, 54 Cal.4th at p. 361 (conc. opn. of

Werdegar, J.); *id.* at p. 369 (conc. opn. of Liu, J.).) They criticized the majority opinion for failing to "persuasively explain how it has determined defendant committed only one punishable act" and thereby creating "uncertainty where none previously existed." (*Id.* at p. 361 (conc. opn. of Werdegar, J.); see *id.* at p. 369 (conc. opn. of Liu, J.) ["[R]easonable minds can and often do differ on how to define the 'act' that constitutes a crime . . . . Today's opinion provides little guidance for making that determination . . . ."].) The majority responded that "[r]ather than force the court to divine what objective or objectives the defendant might have had in possessing the firearm, we find it better to rely on section 654's actual language in resolving this single-act case." (*Id.* at p. 360.)

The court further noted that "[i]n some situations, physical acts might be simultaneous yet separate for purposes of section 654," citing as an example the " 'simultaneous possession' of different items of contraband.' " (*Jones, supra*, 54 Cal.4th at p. 358, quoting *In re Hayes* (1969) 70 Cal.2d 604, 613 [75 Cal.Rptr. 790, 451 P.2d 430] (dis. opn. of Traynor, C. J.) ["[T]he possession of one item is not essential to the possession of another separate item. . . . The possession of each separate item is therefore a separate act of possession."].) The court indicated it did "not intend to cast doubt on the cases so holding." (*Jones, supra*, 54 Cal.4th at p. 358.)

The determination whether Chung acted pursuant to a single intent and objective is a factual one, and we uphold the trial court's determination where supported by substantial evidence. (*People v. Saffle* (1992) 4 Cal.App.4th 434, 438 [5 Cal.Rptr.2d 648].)

### 2. *Counts Four, Five, and Six*

Chung contends that the sentences on counts five and six, for offering to sell methamphetamine and cocaine, respectively, impose punishment for the same underlying act as count four, offering to sell cocaine base. We are unaware of any cases (and the parties cite none) addressing this issue in the context of a single offer to sell multiple drugs to a single buyer. The parties analogize to two different lines of cases in support of their desired results.

Chung relies principally on *In re Adams* (1975) 14 Cal.3d 629 [122 Cal.Rptr. 73, 536 P.2d 473] (*Adams*) in support of her argument that her offer to sell was a single act punishable only once. *Adams* involved a single incident of transportation, during which the defendant used his car to deliver multiple types of drugs to a single dealer. (*Id.* at p. 632.) The defendant was convicted and sentenced on five counts of transportation, corresponding to the different types of drugs he was carrying. (*Ibid.*) The Supreme Court found it was "unreasonable" to fragment the single objective of delivery to the dealer to reflect a different objective for transporting each drug. (*Id.* at p. 635.)

"Instead, the entire transaction should reasonably be viewed as constituting an indivisible course of conduct analogous to the theft of several articles of personal property which . . . results in the commission of a single punishable offense." (*Ibid.*) On the other hand, courts have distinguished *Adams* and allowed multiple punishments where a defendant transported several types of narcotics with the intent to deliver them to multiple buyers. (See, e.g., *People v. Blake* (1998) 68 Cal.App.4th 509, 512 [80 Cal.Rptr.2d 308] [distinguishing *Adams* because the record "supports an inference that defendant intended multiple sales to different customers"].)

For its part, the People cite to a line of cases finding that simultaneous possession of multiple drugs may be punishable as separate acts, as the intent in possessing each drug may be different. (See, e.g., *People v. Barger* (1974) 40 Cal.App.3d 662, 672 [115 Cal.Rptr. 298] [California courts have "uniformly" held that § 654 "does not preclude multiple punishment for simultaneous possession of various narcotic drugs"]; *People v. Monarrez* (1998) 66 Cal.App.4th 710, 715 [67 Cal.App.4th 467a, 78 Cal.Rptr.2d 247] (*Monarrez*) ["different drugs have different effects and pose different dangers to society"]; *People v. Schroeder* (1968) 264 Cal.App.2d 217, 227–228 [70 Cal.Rptr. 491] [multiple punishment for simultaneous possession of various narcotic drugs not precluded by § 654].) Thus, in *Monarrez*, for example, the defendant was convicted of possession of heroin and cocaine for sale after he was found in a family residence with the narcotics. (*Monarrez, supra*, 66 Cal.App.4th at p. 712.) The *Monarrez* court noted that "[i]t was reasonable for the court in *Adams* to find a single illegal intent where the defendant's sole act was to move a large quantity of drugs from one place to another. Furthermore, in *Adams* the evidence showed that defendant intended to deliver all of the drugs to a single recipient." (*Id.* at p. 714.) The evidence in *Monarrez*, by contrast, "supported a finding that defendant had been engaged in multiple sales and intended to make multiple sales of the narcotics which he possessed." (*Id.* at p. 715.)

■ Here, Chung argues her convictions based on an offer to sell multiple narcotics to a single buyer (Moran) is analogous to the single act of transportation of multiple narcotics to a single buyer in *Adams*, and therefore should be subject to one punishment only.[9] The People urge us to follow the possession cases and find that Chung could have had separate objectives for each narcotic she offered to sell. Under the unique factual circumstances of this case, we agree with Chung. Significantly, many of the

[9] Alternatively, Chung contends that her offer to sell was a single act covered under *Jones*, thus requiring no inquiry into her intent or objective(s). We do not believe the question whether Chung committed a single act is as easily disposed of as the circumstances in *Jones* (particularly given the *Jones* court's approval of cases finding separate acts of possession for multiple items of contraband (*Jones, supra*, 54 Cal.4th at p. 358)), and therefore find the application of *Neal*'s "intent and objective" test to remain instructive for our circumstances.

cases holding or approving the idea that a defendant might simultaneously possess multiple narcotics for different reasons rely, at least in part, on the fact that the defendant harbored an intent to sell to multiple people, or had the opportunity to do so. (See, e.g., *Monarrez, supra*, 66 Cal.App.4th at p. 714; *People v. Briones* (2008) 167 Cal.App.4th 524, 529 [84 Cal.Rptr.3d 232] [convictions for possessing both heroin and methamphetamine for sale where it could be inferred that defendant intended multiple sales to different customers]; *Adams, supra*, 14 Cal.3d at p. 635 ["In each of the drug possession cases, the defendant's possession may or may not have been motivated by a single intent and objective, for one may possess drugs for a variety of reasons. . . . [A]lthough we do not disapprove the multiple punishment rule invoked in the drug possession cases relied upon by the People, the rule has no application to situations in which the defendant possesses the drugs for the purpose of accomplishing only a single criminal objective."].) In these instances, a defendant could simultaneously possess multiple narcotics with multiple objectives, for example, to sell some to one buyer, some to another buyer, and retain some for another purpose. But here, Chung was acquitted on all possession charges and convicted only based on evidence of a single offer to sell the narcotics to a single buyer—Moran. There is no possibility that she maintained possession with intent to sell to someone else when the jury found no possession at all. Thus, we cannot say that there was substantial evidence in the record of multiple objectives underlying Chung's single act of offering to sell multiple narcotics to a single buyer.[10]

Further, an additional rationale underlying the allowance of multiple punishments—that such punishment is appropriate where a single act is punishable under multiple statutes directed at distinct evils—cannot survive *Jones*. In *Jones*, the Supreme Court expressly rejected this rationale, noting that the plain language of section 654 is precisely aimed at conduct punishable under more than one statute. (*Jones, supra*, 54 Cal.4th at p. 358.) Thus, whether the Legislature intended to regulate or punish the possession or sale of different narcotics separately has no bearing on whether the conduct at issue is a single act triggering the application of section 654.

---

[10] In briefing and at oral argument, the People pointed to the underlying purpose of section 654 "to ensure that punishment is commensurate with culpability," which has led some courts to deny its application, reasoning that " '[i]t would be absurd to hold that a criminal who deals in one contraband substance can expand the scope of his inventory without facing additional consequences.' " (*Monarrez, supra*, 66 Cal.App.4th at pp. 714–715, quoting *People v. Menius* (1994) 25 Cal.App.4th 1290, 1297 [31 Cal.Rptr.2d 15].) While we reach a different result under the facts here, we note that, as in *Monarrez*, in most instances where a defendant "expand[s] the scope of his inventory" by possessing and/or selling multiple kinds of narcotics, the evidence would likely support "a finding that defendant had been engaged in multiple sales and intended to make multiple sales of the narcotics which he possessed," thus rendering section 654 inapplicable. (*Monarrez*, at p. 715.)

Finally, we note that counts four and six charge violations of the same statute, Health and Safety Code section 11352. This could potentially implicate the holding in *Correa* that section 654 does not apply to bar "multiple punishment for violations of the *same* provision of law." (*Correa, supra*, 54 Cal.4th at p. 340.)[11] However, in *Adams*, two of the counts alleging transportation of two different narcotics (Seconal and Benzedrine) charged violations of the same statute (Health & Saf. Code, § 11379); similarly, the two counts charging transportation of heroin and Pantopon alleged violation of a single statute (Health & Saf. Code, § 11352). Although the statutes (§§ 11379 and 11352) were the same, the court noted that these counts were punishable under separate provisions of the Health and Safety Code and therefore squarely covered by section 654's prohibition of "multiple punishment of an act or omission 'made punishable in different ways by different provisions of this Code.'" (*Adams, supra*, 14 Cal.3d at p. 636.) The *Adams* holding remains undisturbed by *Correa* and we follow it as applicable to the facts here. Ultimately, the court's focus in *Correa* on the plain language of section 654 reflects an intent to exclude from that section's reach only conduct punishable more than once under a single *provision*, a result consistent with *Adams* and inapplicable to this case.

Accordingly, under the particular facts presented here, we conclude that section 654 bars multiple punishments on Chung's convictions under counts four, five, and six. We therefore reverse as to that issue.

## DISPOSITION

The judgment is reversed insofar as it imposes and executes consecutive sentences on counts five and six. The case is remanded to the trial court for sentencing. The judgment is otherwise affirmed.

Epstein, P. J., and Manella, J., concurred.

A petition for a rehearing was denied June 29, 2015, and on June 9, 2015, and June 29, 2015, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied September 30, 2015, S228262.

---

[11] In discussing the scope of section 654, *Correa* appears to use the terms "statute" and "provision" interchangeably. (See, e.g., *Correa, supra*, 54 Cal.4th at p. 337 ["This case involves multiple violations of the *same* statute, while the express language of section 654 applies to an act that is punishable in *different* ways by *different* provisions of law." (original italics)].)